UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,                             :

            Plaintiff,                  :

            -against-                   :      REPORT & RECOMMENDATION

COBALT MULTIFAMILY INVESTORS I,         :      06 Civ. 2360 (KMW)(MHD)
INC.; COBALT MULTIFAMILY CO I,
LLC; COBALT CAPITAL FUNDING,            :
LLC; MARK A. SHAPIRO; IRVING J.
STITSKY and WILLIAM B. FOSTER,          :

            Defendants,                 :

            and                         :

VAIL MOUNTAIN TRUST,                    :

            Relief Defendant.           :
----------------------------------x

TO THE HONORABLE KIMBA M. WOOD, U.S.D.J.:


      The Securities and Exchange Commission ("the Commission") and

the court-appointed receiver for the defendant Cobalt entities have

filed a series of motions, all contested, concerning the receiver's

compensation and the manner in which the civil proceedings

involving the Cobalt companies should be wound up in the interest

of maximizing the return to the allegedly defrauded investors.

These applications include (1) a motion by the receiver for an

interim award of fees and other expenses; (2) a motion by the

Commission for the discharge of the receiver; (3) a motion by the

Commission for consideration and adoption of a plan for

distribution of the assets of the receivership, and (4) the Commission's application for a default judgment against the Cobalt entities. Finally, the receiver in turn has requested that the court stay the Commission's lawsuit, apparently until the receiver completes what he deems to be the full array of his own tasks.

For the reasons that follow, we recommend (1) that the receiver's fee motion be denied without prejudice, (2) that the Commission's motion to discharge the receiver be conditionally denied, (3) that the Commission's application to schedule a notice-and-comment period for its plan for distribution of receivership assets be granted, and (4) that the Commission's motion for a default judgment be granted in part. We also see no reason to stay the Commission's lawsuit and so recommend denying that request.

A. <u>The Current Status of Proceedings</u>

     The Commission commenced this lawsuit on March 27, 2006, alleging that defendants Mark A. Shapiro, Irving J. Stitsky and William B. Foster had set up a series of related companies known as Cobalt and had then engaged in a massive fraud on the investing public, principally through the issuance of a series of false and misleading private placement memoranda and brochures and the use of cold-calls to persuade members of the public to invest money in the

Cobalt companies. According to the Commission's complaint, the defendants obtained more than $15 million from investors through false statements about their own backgrounds, the financial status of Cobalt, and their intention to use investor funds for legitimate investment purposes, with a guaranteed return of eight percent per annum to the investors. Instead, the Commission asserted, the three principals of Cobalt siphoned off much of the invested funds for their own personal purposes, and used newly invested moneys, in a so-called Ponzi scheme, to pay earlier investors some part of the promised eight-percent return.

Contemporaneous with the filing of the complaint, the Commission sought an order to show cause to freeze the defendants' assets and to appoint a receiver under section 21(d) of the Securities Exchange Act, 15 U.S.C. § 78u(d)(5). By order dated March 28, 2006, then-Chief Judge Mukasey granted that application and issued an order freezing the assets of the Cobalt entities and of the individual defendants and appointing Anthony Paduano, Esq. on a provisional basis as the receiver.

The court conducted an evidentiary hearing on May 4, 2006 on the Commission's preliminary injunction motion. At that hearing, the receiver and a Commission accountant testified about their investigation of the affairs of Cobalt, and in large measure

confirmed the allegations of the Commission to the effect that the principals had engaged in fraudulent marketing of investment units in the Cobalt entities and had squandered corporate assets and looted the Cobalt companies of almost all of their funds. (Prelim. Inj. Hr'g Tr. 15-18, 43-72, 88-115, May 4, 2006; see also id. at 23-36 (testimony of defrauded investor); Hr'g Tr. 127-35, May 11, 2006 (summarizing evidence)). Following the hearing and the issuance on July 20, 2006 of oral findings on the motion (Hr'g Tr. 3-12, July 20, 2006), Judge Mukasey issued a written order on July 21, 2006 entering a preliminary injunction that, among other things, definitively appointed Mr. Paduano as receiver for the Cobalt entities.

Since Mr. Paduano's initial appointment, he has pursued a variety of initiatives to marshal the assets of the Cobalt companies and to realize additional sums from claims that the Cobalt entities may have against various individuals and companies. As of June 29, 2007, he reported that the estate had in hand approximately $970,000.00 in funds, nearly half of which represented moneys seized by the United States Government prior to the Commission's lawsuit in conjunction with its criminal investigation of Messrs. Shapiro, Stitsky and Foster. (Letter from Anthony Paduano, Esq., to the Court, June 29, 2007.)

On January 23, 2007, the receiver filed an application for a court order authorizing an interim payment of $733,488.27 to himself, his firm and various professional entities that he had hired to assist in managing the affairs of the Cobalt estate. In doing so, he also advised that the total accrued fees and expenses generated by the work of his firm, three other law firms, a forensic accounting firm, another accountant and a bankruptcy practitioner on behalf of the Cobalt estate exceeded $2.7 million for just the eight-month period from March 28, 2006 to the end of 2006. The Commission opposed the receiver's fee motion, arguing that the gargantuan fees sought as an "interim" award would virtually exhaust the assets collected for the benefit of the defrauded investors and that the Court should therefore calculate the receiver's fees by awarding a percentage of what the receiver recovers on behalf of the Cobalt investors. In the alternative, the Commission argued that even if the Court were to award the fees on anything other than a percentage basis, the amounts billed were completely unjustified by the needs of the receivership and were also inadequately documented.

On March 20, 2007, the Commission filed a motion seeking the entry of a default judgment in its suit as against the defendant Cobalt entities, since they have not answered or otherwise

responded to the complaint, which was served in early 2006.[1] For relief, the Commission sought entry of a permanent injunction, an order of disgorgement in an amount exceeding $24 million and an award of an unspecified amount in penalties. The receiver opposed this motion. He first argued that the proposed injunction should be denied as moot because the companies are no longer in operation and therefore need not be enjoined from violating the securities laws. He also asserted that the standard for default has not been met because the default was not willful, that a default judgment would prejudice the position of the defrauded investors in a lawsuit filed on their behalf, and that the Cobalt entities have a colorable defense. Finally, he argued both that Cobalt should be given an opportunity to answer and litigate, or at least should be given the chance for an inquest to determine damages, and that for him to defend Cobalt against the Commission's claims would involve great expense to an already very limited fund of moneys in the Cobalt estate coffers.

On May 3, 2007, the Commission moved for an order discharging the receiver. In substance, the Commission asserted that the receiver's useful work in collecting assets for the Cobalt estate

_____

[1] As will be explained, an answer was belatedly filed on behalf of the Cobalt defendants by a law firm, but that pleading was withdrawn one week later. The firm withdrew at the same time as counsel for Cobalt and has never been replaced.

had long since been completed and, in the alternative, that by virtue of his fee application he had a disabling conflict of interest with the defrauded shareholders, whom he had been appointed to represent. The Commission further argued that the receiver had breached his obligation to the court by not cooperating with the Commission. In substance, the Commission argued that the receiver had performed so inefficiently as to imperil the ability of the Commission to provide a maximum return to the victimized investors, and that the court should instead focus on a plan for distribution of those assets -- a plan that the Commission advised it would soon recommend for comment and approval. The Commission also proposed that, in view of the pendency of several lawsuits filed by the receiver in which he sought to enforce claims by Cobalt against various individuals and entities, the receiver should first be discharged and then specially reappointed for the limited purpose of pursuing those claims, with compensation to be on a contingency basis.

The receiver opposed this motion, contending that he had no conflict of interest with the investors, that he had further work to do for the Cobalt estate and that the Commission was to blame for the failure to locate substantial assets looted from the Cobalt entities. He also argued, both in his response to the discharge motion and in his reply to the Commission's response to his motion

for fees, that he should be paid his fees in full on an hourly basis. Nonetheless, in his reply in the fee-application motion he suggested that if his pending fee-and-expense motion were otherwise granted in full, he would be willing to pursue his current lawsuits for Cobalt on the suggested contingency basis.

On May 24, 2007, the Commission moved for an order setting a schedule for comment and approval of a plan for distribution of the currently collected and future Cobalt assets to pay receivership expenses and to compensate the defrauded investors and the creditors of Cobalt. The plan was based on a formula that would authorize (after a set-aside for administrative expenses) payment of half the net assets to the shareholders, and a quarter each to Cobalt's creditors and the receivership professionals.

The receiver opposed this motion, arguing that presentation of a distribution plan is premature, and that it would pose the serious danger of compelling the creditors of Cobalt to force an involuntary bankruptcy filing, which would deprive the investors of any recovery. He further asserted that the plan proposed by the Commission is seriously flawed in a number of other respects.

<u>ANALYSIS</u>

We first address the Commission's default motion and then proceed to the remaining applications.

A. <u>The Motion for a Default Judgment</u>

The Commission notes that it served the complaint on the defendant Cobalt entities on May 3, 2006, and that an answer was filed on their behalf by the law firm Certilman Balin Adler & Hyman on August 3, 2006, but that by stipulation filed August 10, 2006, the answer was withdrawn.[2] (Decl. of Paul W. Ryan, Esq. ¶ 5, Mar. 20, 2007.) Since that time, these defendants have failed to answer or otherwise respond to the complaint. Accordingly, the Commission seeks entry of a default judgment against them.

The relief that plaintiff seeks on this motion includes (1) a permanent injunction, (2) an order requiring disgorgement of $24,672,600.00, a sum that is said to reflect the defendants' "ill gotten gains" together with pre-judgment interest through March 1, 2007, and (3) imposition of a civil penalty in an unspecified amount. (<u>See</u> Mem. of Law in Supp. of Pl. SEC's Application for

---

[2] The Certilman firm withdrew as counsel for the Cobalt entities on the same day and has never been replaced.

Default J. 19-22; Mar. 20 Ryan Decl. ¶¶ 9-10 & Ex. G.) In seeking these monetary awards, the Commission argues that the record, including the allegations of the complaint, suffices to establish, in substance, that the principals of Cobalt induced members of the public to invest approximately $23 million in Cobalt and then siphoned off for their own use a large part of these funds.

The receiver has opposed the default motion. In doing so, he notes that a default judgment is a drastic remedy and that the court has discretion whether to grant such an application. He argues that the Court should deny the motion for a default judgment because the default was not willful, it did not prejudice the Commission in any way because the action against the individual defendants was stayed, and Cobalt has a meritorious defense (that the corporations are not liable for the fraudulent actions of their principals in this case). He further argues that to grant a default here would be detrimental to the interests of the investors and creditors of Cobalt. Specifically, he asserts that the award of disgorgement and penalties to the Commission would empty the limited coffers of the estate and place the money in the United States Treasury, where, he suggests, it would be used for general governmental purposes, thus depriving the injured parties of the compensation that he is seeking to obtain for them. (Aff. of Anthony Paduano, Esq. ¶ 2(v), Apr. 10, 2007; Receiver's Mem. of Law

in Resp. and Opp'n to the SEC's Mot. for Default J. and in Supp. of the Receiver's Cross-Mot. to Stay the Action 3.) On a more technical level, he argues that any findings on default concerning the responsibility of the Cobalt corporations for the acts of the Cobalt principals -- that is, Messrs. Shapiro, Stitsky and Foster -- could undercut the receiver's position in a lawsuit (Cobalt v. Shapiro, 06 Civ. 6468 (KMW)(MHD)) that he is currently pursuing for Cobalt against three sets of attorneys who represented these entities before their demise. (See Apr. 10 Paduano Aff. ¶ 2(iv); Receiver's Default Mem. of Law 12.)[3] The receiver further asserts that before a default judgment is entered, the court should order an evidentiary hearing, presumably to assess whether the monetary relief sought by the Commission is warranted. (Receiver's Default Mem. of Law 14.) On this point, the receiver suggests that such proceedings would require a substantial investment of his time and therefore would drain the limited resources of the receivership estate. (Apr. 10 Paduano Aff. ¶ 7.) Finally, he argues that the Commission's request for injunctive relief is moot since the Cobalt companies are defunct, although he appears also to say that he

---

[3] The receiver points out that in a pending motion to dismiss in that case, the attorney defendants have asserted (similarly to the argument here of the Commission) that the wrongdoing of the Cobalt principals is deemed to be that of the Cobalt entities. Those attorney defendants argue on their motion that, because the wrongdoing of the principals is imputed to the Cobalt companies, Cobalt -- and by extension the receiver -- lack standing to pursue claims against the attorneys for aiding the fraud of the Cobalt principals.

would not oppose the entry of such an injunction. (Apr. 10 Paduano Aff. ¶¶ 3, 5; Receiver's Default Mem. of Law 3-4.)

Default is generally disfavored, and any doubts are to be resolved in favor of a trial on the merits. Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981); see also New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005). The entry of a default judgment is certainly discretionary with the court, see, e.g., Land, Air & Sea Transport v. El Nasr Mining Co., 2007 WL 2375813, at *1 (S.D.N.Y. Aug. 16, 2007) (citing Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993)), but a determination not to do so is generally based on findings that the defaulting parties did not act willfully, that a failure to enter a default would not prejudice the plaintiff and that the case can and should proceed to a determination of the merits of the claims against the defaulter since he has at least a colorable defense to whatever claims are at issue. See, e.g., Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 514 (2d Cir. 2001); Enron Oil Corp., 10 F.3d at 96. Those considerations do not support the receiver's position here, and the particular arguments that he advances against entry of a default judgment are not convincing.

To characterize a default as willful, the court must find either that it was in bad faith, or at least that it was something

more than a careless or negligent error. <u>See</u>, <u>e.g.</u>, <u>American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.</u>, 92 F.3d 57, 60-61 (2d Cir. 1996). Nonetheless, courts "have refused to vacate a judgment where the moving party had apparently made a strategic decision to default." <u>Green</u>, 420 F.3d at 109 (internal quotation marks omitted) (quoting <u>American Alliance</u>, 92 F.3d at 60).

There is no question that, since withdrawing their original answer, the Cobalt defendants have failed to respond to the complaint. There is also nothing in the record to suggest that that inaction was due to oversight or some other rationale that might militate against entry of a default judgment. Indeed, within one week after the initial filing of an answer in early August 2006, the attorneys for these defendants, the receiver and the Commission all stipulated to the withdrawal of that pleading and to the withdrawal of the Certilman firm as counsel for the Cobalt entities. Since that time, no attorney has entered an appearance for Cobalt or sought to interpose an answer or other response to the complaint. We must infer, absent any evidence to the contrary, that this sequence of events reflects a decision by the receiver or whoever else had responsibility at that point to protect the interests of the Cobalt companies to allow Cobalt to go into

default.[4]

Moreover, we note that this decision was entirely reasonable given the facts of record at that time. The essential facts pertinent to the Commission's claims against the Cobalt principals and the companies had been laid out in some detail through the testimony of the receiver at the May 4, 2006 hearing before Chief Judge Mukasey and were reiterated in the judge's findings (see July 20 Hr'g Tr. 3-12), as well as in the receiver's periodic reports to the court. (See Decl. of Nancy A. Brown, Esq. Ex. A, Apr. 13, 2007.) It was also apparent by that time that the Cobalt estate had only a small fraction of the assets needed to satisfy the claims against it, both by defrauded shareholders and by creditors.[5] In addition, there appears not to have been a serious question, based on both the Government's criminal investigation and the subsequent indictments of the Cobalt principals, that the investing public had

_____

[4] We also note, as a purely technical matter, that "'[i]t is settled law that a corporation may not appear in a lawsuit against it except through an attorney, and that, where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55, F[ed]. R. Civ. P.'" Grace v. Bank Leumi Trust Co. of N.Y., 443 F.3d 180, 192 (2d Cir. 2006) (quoting SEC v. Research Automation Corp., 521 F.2d 585, 589 (2d Cir. 1975)) (alterations in original).

[5] Current creditor claims (exclusive of the receivership professionals' claims) and claims by non-IRS tax authorities are listed in exhibits B, D and E to the declaration of Nancy A. Brown, Esq., executed May 24, 2007 and filed in support of the Commission's motion for a schedule to approve the Commission's distribution plan.

been defrauded by those principals, and as a consequence that the corporations were almost certain to be subject to liability for that securities fraud. To retain counsel at that point to defend against civil liability would simply have drained the limited assets available for the victims of the fraud, all to no benefit for the corporations.

Apart from the evident deliberation that led to the Cobalt defendants' default, we note that there is no reason to suggest that these defendants have a colorable defense. A defense need not be ultimately persuasive, but is "meritorious if it is good at law so as to give the factfinder some determination to make." <u>American Alliance</u>, 92 F.3d at 61 (internal quotation marks omitted) (quoting <u>Anilina Fabrique de Colorants v. Aakash Chemicals and Dyestuffs, Inc.</u>, 856 F.2d 873, 879 (7th Cir. 1988)). Nonetheless, the defense cannot consist of mere conclusory denials. <u>See</u> <u>Green</u>, 420 F.3d at 110. In the receiver's memorandum, he suggests no such meritorious defense,[6] and he fails to address the significance of his own testimony and that of the other Commission witnesses at the preliminary injunction hearing. Moreover, the receiver himself has

---

[6] He refers only to the possibility that the wrongs of the Cobalt principals may not be imputed to the Cobalt entities. For reasons noted in our report and recommendation dated November 28, 2007 in <u>Cobalt v. Shapiro</u>, 06 Civ. 6468 (KMW)(MHD), it is plain that at least with respect to the securities-fraud claims, the principals' actions are imputable to the corporations. (<u>See</u> Report & Recommendation 50-58.)

pursued parallel allegations and claims against the Cobalt principals in his separate lawsuit on behalf of the Cobalt entities in <u>Cobalt v. Shapiro</u>, 06 Civ. 6468 (KMW)(MHD) and against the former marketers of Cobalt ownership units in <u>Cobalt v. Arden</u>, 06 Civ. 6172 (KMW)(MHD).

As for the specific arguments now pressed by the receiver to oppose a default, except in one respect they do not justify denial of the Commission's motion. The process of entering a default judgment will not constitute a drain on the receiver's time or the assets of the Cobalt estate. The motion has been fully briefed and the entry of a judgment will involve only a series of mechanical or ministerial steps by the Commission and court personnel. The receiver need not be involved and need spend not a penny of the estate resources.

There is also no basis for the receiver's contention that the court must conduct an evidentiary hearing before entering a default judgment. The effect of a default is to establish the truth of the well-pled allegations of the complaint that are pertinent to liability, <u>see</u>, <u>e.g.</u>, <u>Bambu Sales, Inc. v. Ozak Trading Inc.</u>, 58 F.3d 849, 854 (2d Cir. 1995); <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, 973 F.2d 155, 158 (2d Cir. 1992), and in this case those detailed allegations amply establish the

defendants' liability for securities fraud. Moreover, there is an adequate evidentiary record to demonstrate a factual basis for reaching the same conclusion.

As for monetary and injunctive relief, the Second Circuit has made clear that the trial court has broad discretion to adopt procedures for the assessment of monetary awards and other relief in the face of a default, including reliance on affidavits or documentary evidence proffered by the plaintiff in lieu of an evidentiary hearing. See, e.g., Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (citing cases). The receiver offers no insight as to what evidence he would wish to offer at a hearing that would be pertinent to the question of the size of a disgorgement order. Moreover, in this case the documentation relied upon by the Commission for its calculation of the amount of the defendants' enrichment through the misconduct of the Cobalt principals -- which is the general measure guiding the imposition of a disgorgement order, see, e.g., SEC v. Cavanagh, 445 F.3d 105, 116-20 (2d Cir. 2006) -- was in fact provided to the Commission by the receiver based on his investigation, including a list of investors and the size of their investments in Cobalt. The receiver also does not even attempt at any point to impeach the accuracy of that data, on which he himself relied in earlier submissions to the court. (See Apr. 13 Brown

Decl. Ex. A at 4; Cobalt v. Shapiro, 06 Civ. 6468, Compl. ¶ 4; Cobalt v. Arden, 06 Civ. 6172, Compl. ¶ 5.) The receiver also does not suggest that any set-offs for payments by Cobalt to some of the investors -- if such set-offs were required in measuring the amount to be disgorged -- cannot be gauged based on available Cobalt records; but, in any event, such an inquiry is unnecessary for determining the amount of disgorgement since that calculation "need not be tied to the losses suffered by defrauded investors." Official Comm. of Unsecured Creditors of Worldcom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006) (internal quotation marks omitted) (quoting SEC v. Fischbach Corp., 133 F.3d 170, 175-76 (2d Cir. 1997)).

Furthermore, entry of a default judgment will not prejudice the position of the Cobalt defendants as plaintiffs in their suit against the former Cobalt attorneys. For reasons addressed in a report and recommendation issued in Cobalt v. Shapiro on November 28, 2007, the Cobalt entities and the receiver cannot assert claims against the defendant attorneys for assisting the Cobalt principals in committing securities fraud.[7] This bar on suit -- based on lack

---

[7] The Court in Cobalt v. Shapiro found that a receiver does not have standing to sue outsiders on behalf of the corporation for fraud committed by corporate insiders because that is an injury to the shareholders and creditors rather than the corporation. (See Report & Recommendation 45-46.)

18

of standing by those entities -- is not affected by anything that would occur in this lawsuit. As for the balance of the claims pursued by the receiver in that other lawsuit, the report and recommendation explains that the conversion and fraudulent-transfer claims, as well as the receiver's effort to have the attorneys remit fees paid for their allegedly negligent services, are viable on the face of the complaint, and entry of a default here against the Cobalt entities would not affect that analysis. Moreover, insofar as the receiver presses claims of malpractice or fiduciary breach based on attorney assistance to the Cobalt principals in looting corporate assets, those claims will turn on the unresolved question of whether there were potential corporate decision-makers other than the Cobalt principals who, if advised of those principals' misconduct, might have prevented it. (Report & Recommendation 42-44, 50-58.) That question, and the evidentiary inquiry that it requires, will not be foreclosed by the entry of a default judgment here against the Cobalt entities.

This conclusion follows from a consideration of the collateral estoppel analysis that the receiver is implicitly invoking. To trigger collateral estoppel, a party must demonstrate that (1) a factual issue in question in its own litigation has been previously raised and determined in another lawsuit to which its adversary was a party or in privity with a party, (2) the issue was actually

litigated and decided in the other lawsuit, (3) the party or its privy had a full and fair opportunity to litigate the question, and (4) the determination of the issue was necessary to support a valid and final judgment on the merits entered in that other lawsuit. See, e.g., Indus. Risk Insurers v. Port Auth. of N.Y. & N.J., 493 F.3d 283, 287 (2d Cir. 2007) (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)). Assuming for the moment that a default judgment may have this preclusive effect, we nonetheless conclude that the factual issues implicitly and necessarily determined here by a default judgment would not answer the questions posed in the receiver's separate litigation against the former Cobalt lawyers concerning the alleged abandonment by the Cobalt principals of their duty of corporate loyalty and the availability of other potential decision-makers to end the misconduct.[8]

Finally, denial of a default judgment would potentially prejudice plaintiff insofar as the Commission is representing the

---

[8] In assessing the receiver's argument on this point, we note as well the Commission's uncontradicted representation that it proposed to the receiver a consented-to default judgment that would have expressly declined to adjudicate the Cobalt entities' responsibility for the Cobalt principals' misconduct, and that the receiver declined on grounds that he was not the equivalent of Cobalt, that he had insufficient information to agree that there had been a securities violation and that taking that position might impair his ability to pursue outstanding claims. (See Apr. 13 Brown Decl. ¶¶ 3-4 & Ex. B.)

interests of the defrauded shareholders. If the receiver is given the opportunity at this stage to litigate on behalf of the Cobalt entities, those efforts will serve only to further drain the assets of the receivership, all to no evident purpose.

There remains the question of what relief is appropriate at this time as a consequence of an entry of a default against the Cobalt entities. The receiver appears to concede the propriety of injunctive relief against future violations even while insisting that this request by the Commission should be deemed moot under the current circumstances since the Cobalt entities are effectively defunct. Although it is most unlikely that anyone will seek to revive these entities, that does not preclude the prophylactic imposition of injunctive protection against further misconduct by these defendants in the unlikely event that they resume their corporate life in the future. Given the allegations of the Commission's complaint pertinent to liability as well as the evidence of such past misconduct, the terms of the injunction sought by the Commission permanently enjoining defaulting defendants from further violating securities laws are appropriately incorporated in a judgment.[9]

_____

[9] The injunction would enjoin the defaulting defendants, or the Cobalt entities and their principals, from violating § 10(b) of the Securities Exchange Act of 1934 (and Rule 10-b, promulgated thereunder) (prohibiting them from employing any

The Commission also requests monetary relief in the form of an order of disgorgement and a statutory penalty. Despite the receiver's claims that the money would simply go into the general account of the Treasury, the Commission's reply papers make crystal clear that the Commission seeks to utilize any recovery of funds from the corporate defendants to compensate defrauded shareholders and creditors of the Cobalt entities. (Reply Mem. of Law in Further Supp. of Pl. SEC's Application for Default J. 1, 6.) Moreover, the court has ample authority to direct that these disgorged funds be used for purposes consistent with the equitable powers assigned to it by section 21(d), including specifically the compensation of defrauded investors. See, e.g., Cavanagh, 445 F.3d at 117 ("Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation."); accord Official Comm. of Unsecured Creditors of WorldCom, 467 F.3d at 81 ("[I]t remains within the court's discretion to determine how and to whom

---

means to defraud, obtaining money or property by material untruths and misleading omissions, and engaging in an act that operates as a fraud or deceit), § 17(a) of the Securities Act of 1933 (same), §§ 5(a) and 5(c) of the Securities Act (prohibiting them from offering or selling a security by means of a prospectus before a registration statement has been filed, if the security is not exempted), and § 15(a) of the Exchange Act (prohibiting an entity from selling any security, unless exempted, if the entity is not registered with the Commission as a broker or dealer). ([Proposed] Default J. and Order as to Defs. Cobalt Multifamily Investors I, LLC, Cobalt Multifamily Co. I, LLC, and Cobalt Capital Funding, LLC.)

the money will be distributed.") (internal quotation marks omitted) (quoting <u>Fischbach Corp.</u>, 133 F.3d at 175).

In the absence of any meaningful dispute at this stage as to the approximate amount of the funds invested in the defendant corporations by the defrauded investors, we recommend that the court include in its default judgment a provision requiring disgorgement in the amount of $24,672,600.00, to be used to compensate investors and creditors and to meet estate expenses. This figure reflects roughly the amount invested by the defrauded shareholders in Cobalt together with interest,[10] and it approximates the amount by which the corporations were enriched through the fraudulent representations of the Cobalt principals. (<u>See</u> SEC Mem. of Law in Supp. of Application for Default J. 22.) Although this figure may somewhat overstate the total investor losses because some of the moneys invested were returned to some of the initial investors as part of their promised eight-percent return, precision is not required since disgorgement need not be limited to such losses and indeed may exceed them in the interest of deterrence. <u>See</u>, <u>e.g.</u>, <u>SEC v. Warde</u>, 151 F.3d 42, 50 (2d Cir. 1998).

---

[10] The Commission based its estimate of the prejudgment interest on IRS rates of interest on tax underpayments and refunds. (Mar. 20 Ryan Decl. ¶ 10.) The calculation covered the period from March 27, 2006 to March 1, 2007. (<u>Id.</u>)

As for the Commission's request for the imposition of penalties against the Cobalt entities, we recommend that the court decline at this time to make such an award. We do so for several reasons. First, it is as yet unclear whether the Cobalt entities themselves bear any responsibility for the fraud beyond the imputation of liability for the Cobalt principals' actions implied by the corporate default. Second, even if they do, the degree of that responsibility cannot be evaluated on the current record. Third, it is unclear whether any assets beyond the current minimal amount will find their way into the receivership estate, and, unless substantial additional funds are found, the imposition of penalties on the companies will be an exercise in futility. In short, the relief sought by the Commission in this respect appears both unnecessary and even potentially a distraction, in view of the posture of this case and particularly the Commission's more recent application for adoption of a plan to distribute the available assets of the Cobalt estate to investors, creditors and the receiver.

As noted, the losses to investors alone, as calculated by the Commission, range up to $23 million (the approximate total of funds invested by the public in Cobalt). (Decl. of Nancy A. Brown, Esq., Second Ex. A ¶¶ 16(c), 17(c), May 24, 2007.) The Commission further lists creditor claims (exclusive of claims by the receivership

professionals) in excess of four million dollars. (<u>See</u> May 24 Brown Decl. Exs. B, D & E.) Meanwhile, the available assets constitute only approximately one million dollars, and at least some of those funds must go to cover the expenses of the receivership and the administrative costs of any distribution plan. Hence, the return to the investors will inevitably amount to only pennies on the dollar unless the Cobalt estate is the beneficiary of an as-yet unexpected windfall. Under the circumstances, there simply is no reason to engage in litigation over the appropriateness and amount of a penalty to be paid by those entities, which plainly are in no current position to do so.

In sum, we recommend that the motion for a default judgment be granted in part, and that the court enter a partial judgment enjoining the Cobalt defendants from any future violations of the federal securities laws, in terms consistent with those proposed by the Commission, and that the judgment also order disgorgement of $24,672,600.00. We recommend, however, that the Court deny, without prejudice to renewal, the Commission's request for imposition of penalties against the Cobalt corporations.

B. <u>The Fee Motion and Remaining Applications</u>

On January 25, 2007, the District Court received from the

receiver what he characterizes as his "First Application to Approve Fees and for Allowance of Interim Compensation to Pay Professionals." By this motion, the receiver seeks an order applying at least $733,488.27 from the assets of the Cobalt estate to pay for a variety of receivership fees and expenses incurred from March 28 through December 31, 2006. These include fees and expenses billed by the receiver personally ($115,050.33), his law firm Paduano and Weintraub ($380,854.59), the accounting firm RSM McGladrey ($78,207.00), the law firm Hogan & Hartson ($139,712.59), the law firm Kirkpatrick & Lockhart ($7,754.79), the law firm Secore & Waller ($2,740.21) and the accountant Keith Kramer ($9,168.76). The receiver also refers to a retainer of $15,000.00 paid to a Michael Gottfried, Esq., to act as bankruptcy counsel for the Cobalt companies, but he does not include that sum in his calculation of the total being sought. (Fee Application 2.) If that omission was inadvertent, the receiver's application must be read as asking for payment of $748,488.27. According to the receiver, the amount that he seeks is a modest portion of the total fees and expenses incurred at the time of his application, which he reports as totaling $2,748,238.95 through year-end 2006. (Fee Application ¶ 14.)

The Commission opposes this application in its entirety. It does so principally on the basis that the award sought by the

receiver would consume virtually all of the current assets of the Cobalt estate and ensure that the investors -- for whose protection this litigation was commenced and the receiver appointed -- would receive virtually nothing. (Objection of the SEC to the First Interim Fee Application of the Receiver, His Attorneys and Other Professionals 1.) Moreover, the Commission notes that, given the amount of fees and expenses accrued by the receivership professionals as of year-end 2006 (a total in excess of $2.7 million), the investors would almost certainly be deprived of any compensation even if the receiver succeeded in his various pending lawsuits to recover damages for the Cobalt entities. (Id.) The Commission also points out that the receiver's efforts to marshal assets have yielded only about $400,000.00 in funds, over and above the approximately $490,000.00 previously seized by the Government and then turned over to the receiver, thus implicitly arguing that the disproportion between benefit and expense should prevent the receiver from recovering the fees that he requests. (Id. at 1, 4.)[11] Instead of granting any part of the receiver's fee-and-expense application, the Commission urges that the court defer any award to

---

[11] The receiver offers differing estimates of the amount of money seized from the Cobalt entities by the Government. In his filings in this case, the receiver characterizes the amount as $380,000.00. (See Aff. of Anthony Paduano, Esq. ¶ 13 n.3, May 31, 2007.) Meanwhile, in his complaint in Cobalt v. Shapiro, 06 Civ. 6468, he claims that the FBI seized investor funds in the amount of $490,000. (See Cobalt v. Shapiro, 06 Civ. 6468, Compl. ¶¶ 89-90.) In any event, this difference is immaterial for our present purposes.

the receiver until the Commission has submitted its proposed plan for distribution of Cobalt assets and that it then apply a percentage-based fee as outlined in that proposed plan. (Id. at 1-2.)

Alternatively, the Commission argues that the fees and expenses sought by the receiver are grossly excessive and his application otherwise flawed. Thus, it notes that the time summaries for the receiver and his firm are too opaque for a reviewer to discern the specific tasks on which the various lawyers have spent their time. In addition, the Commission argues that the record reflects that the receiver and his firm have devoted far too much time and too many resources -- including vast phalanxes of attorneys and other professionals -- to projects that could not conceivably yield a sufficient return to justify such an investment of time and manpower. (Id. at 6-12.)[12]

In reply, the receiver focuses on what he interprets as a demand by the Commission that he and other professionals be paid on the basis of a percentage of the assets recovered by them, an approach that the receiver opposes. In this regard, he contends that neither he nor any of the other professionals whom he hired

_____

[12] The Commission also complains about over-billing for travel and other expenses, such as computer research. (SEC Objection to Fee Application 13.)

would have agreed to work on the Cobalt estate under such an arrangement, and that they all assumed that they would be paid on the basis of the hours that they had billed. (E.g., Receiver's Reply Mem. of Law in Supp. of his First Application to Approve Fees and for Allowance of Interim Compensation to Pay Professionals 5; see also, e.g., Decl. of Anthony Paduano, Esq. ¶ 5, Feb. 12, 2007; Aff. of Brian R. Forbes, Esq. ¶ 7, Feb. 12, 2007; Aff. of Keith Kramer, Esq. ¶ 7, Feb. 12, 2007; Aff. of David B. Dyer, Esq. ¶ 8, Feb. 9, 2007; Aff. of Franklin O'Toole ¶ 10, Feb. 12, 2007; Aff. of Alvin F. Lindsay, Esq. ¶ 8, Feb. 12, 2007.) He also argues that his time summaries are adequate, that the amount of time spent was reasonable and that the fee-and-expense request should be granted in full. (Feb. 12 Paduano Decl. ¶¶ 5, 23-35; Receiver's Fee Reply Mem. of Law 5-9.)[13] The only concession that he offers in this regard is his stated willingness to pursue the various lawsuits that he has commenced for Cobalt on a contingency basis, provided that the balance of his fee-and-expense application is granted. (Feb. 12 Paduano Decl. ¶¶ 4-6, 9-10 & n.1.)

Although these are the arguments that the parties press in those of their papers that are devoted to the fee application, the disposition of that motion requires consideration as well of

---

[13] On his reply, the receiver also submitted for in camera review the time records of the various law firms and accountants whom he had hired to assist in his work.

certain matters raised in the Commission's two subsequent motions -- to remove the receiver and to propose a plan to distribute the Cobalt assets. We briefly summarize the pertinent points.

As noted, in early May 2007 the Commission sought the removal of the receiver, contending that the receiver's relevant tasks -- principally the marshaling of Cobalt assets -- had been largely completed, that the only loose ends involved the completion of the lawsuits previously filed by the receiver, and that for this purpose he could be reappointed on the basis of a contingency-fee arrangement. The Commission also asserted that, in light of his fee application, he suffered from a disabling conflict of interest since he was competing with the Cobalt shareholders and creditors for a limited fund.

The receiver opposed the motion to relieve him, and in doing so accused the Commission of failing to cooperate with his efforts to locate the missing investor funds and seeking prematurely to close the receivership. In pursuing this argument, Mr. Paduano recounted in some detail his version of his dealings with the Commission, and -- of particular relevance to the fee question -- he mentioned that in November 2006 the Commission's staff members had informed him that they wanted to wind up the Cobalt estate and that in doing so they intended to file a motion for leave to place

the Cobalt entities in bankruptcy. (May 31 Paduano Aff. ¶ 13.)
Although the Commission never took this step, the receiver
represents that it was solely in anticipation of that action that
he filed the current fee-and-expense motion, an effort that -- as
he claims he told the Commission -- would be for "no good purpose,"
presumably because the Cobalt estate at that point had such limited
resources:

> Thus, contrary to our prior approach not to have
> professionals make fee applications because there
> simply was no Cobalt money to pay them, we told the
> Staff that their about-face would require that those
> applications be made, but for no good purpose.

(Id.)[14]

Of further relevance to the fee question, we note that in the
Commission's latest motion, for court approval of a plan to
distribute the Cobalt assets, it proposes that the funds currently
on hand, less administrative costs, be distributed on the basis of
a one-half share going to the Cobalt shareholders, with quarter
shares being paid, respectively, to Cobalt's creditors and to the
receiver and the professionals whom he had retained to provide
services to the receiver. (See May 24 Brown Decl. First Ex. A

---

[14] As the receiver also noted, "If a fee application had been
made and granted for the period ending April 30, 2006, the
$380,000 that the SEC had turned over to us would have been gone
and the efforts undertaken since then would not have occurred."
(May 31 Paduano Aff. ¶ 13 n.3.)

(proposed plan) ¶¶ 16(c), 17(c).)

We address each of these three motions seriatim.

1. The Fee Motion

The receiver seeks in excess of $730,000.00 (or as much as $748,000.00) to pay himself, his law firm, three other law firms, a bankruptcy practitioner, a forensic accounting firm and an accountant for services rendered to the Cobalt estate from March 28, 2006 to the end of that year. That award would constitute a disposition to the receiver and other professionals of more than three-quarters of the currently-available assets of the Cobalt estate, and would represent a payment to them of as much as 150 percent of the assets actually marshaled by the receiver during the time frame in question.[15] Moreover, this proposed "interim" payment reflects only slightly more than a quarter of the total fees and expenses that the receiver and other professionals are apparently prepared to claim for the same eight-month time period.[16]

_____

[15] Insofar as the receiver arranged to limit or cancel claims against Cobalt, he properly notes that the figure reflecting assets marshaled by him understates the benefits that he has conferred on the Cobalt estate. (Feb. 12 Paduano Feb. Decl. ¶¶ 17-22.) Nonetheless, the payment of fees to the receiver is limited to assets actually available to the estate.

[16] The only information about the accumulation of fees and expenses since year-end 2006 is a representation by the receiver

32

In making this application, we understand that the receiver views the appropriate procedure for winding up this estate as involving at least this "interim" payment to him and his retained professionals for their 2006 work, thus virtually denuding the estate of assets, followed by a period of time in which he pursues -- possibly on a contingency-fee basis -- the pending lawsuits against the former Cobalt lawyers, the former sales staffers of Cobalt and perhaps the three currently indicted former principals of Cobalt. Once those lawsuits are completed, he will be prepared to propose a plan for distribution of the remaining assets, presumably to be divided among the defrauded shareholders of Cobalt, the Cobalt creditors (who are listed as having claims in excess of $4 million)[17] and the receivership professionals, including himself.

_____

that additional fees incurred by Paduano & Weintraub through April 2007 total less than $200,000.00. (May 31 Paduano Aff. ¶ 27.) That alone suggests that the receiver may ultimately seek nearly three million dollars in fees and expenses from the Cobalt estate, together with a percentage of any recovery in the lawsuits that he commenced for Cobalt.

[17] We note that the receiver and Commission pursue an extended argument about the true valuation of a surviving claim against Cobalt by its former lender Bridge Capital; indeed, even Bridge Capital enters the fray. (See, e.g., Bridge Capital's Resp. to Mot. for Order Setting Distribution, Objection and Hearing Schedule for Plaintiff's Proposed Plan for Distribution of Receivership Assets and an Order Approving Plaintiff's Proposed Plan.) We need not resolve this somewhat arcane dispute at present, as it does not affect in any way the findings and conclusions on which we rely in making our recommendations about the current motions.

For present purposes, we recommend that the receiver's fee-and-expense motion be denied. As he himself concedes, the application -- whatever its other merits or demerits -- is unworkable given the limited assets collected to date on behalf of the Cobalt receivership. Indeed, he admits that, but for the Commission's stated intention to place Cobalt in bankruptcy, he would not have filed this motion. Although we understand the logic of seeking an early fee award in the face of a prospective bankruptcy filing, in fact the Commission never pursued bankruptcy, and the receiver fails to justify his demand in the current circumstances. Indeed, his representation that he never intended to make an early fee application until the Commission decided to pursue a bankruptcy option underscores the evident fact that none of the receivership professionals have a sufficiently pressing need for immediate compensation to justify draining the estate at this point of nearly all of its assets.[18]

Moreover, avoidance of a fee award at this stage is consistent as well with the receiver's repeated assertion that the receivership estate would be imperiled if the current assets are now distributed to investors and creditors on an interim basis, since dissatisfied creditors, uncertain of how much ultimately will

---

[18] Indeed, the receiver claims that he filed the fee motion only because the Commission insisted that he do so. (See Letter from Leonard Weintraub, Esq., to the Court, Apr. 13, 2007.)

be left for them, would be likely to pursue objections to the plan and even an involuntary bankruptcy filing. (<u>See</u> Aff. of Anthony Paduano, Esq., ¶¶ 4, 13, July 13, 2007 (filed in response to the Commission's motion for adoption of a distribution plan).) The very same logic suggests that an interim payment to the receivership professionals would have the same effect.

If we follow the receiver's logic and credit his speculation about the viability of his various pending lawsuits, a determination of the full extent of the compensation to be paid to the receivership professionals should await the final accumulation of available assets. Since, however, it is also quite possible that those lawsuits will not produce meaningful additional funds, it would be plainly inappropriate at this stage to pay the overwhelming bulk of the available Cobalt assets to these professionals based on speculation as to the value of the lawsuits, thus potentially leaving the Cobalt investors and Cobalt creditors with no meaningful recovery.

In reaching this conclusion, we need not assess the reasonableness <u>vel</u> <u>non.</u> of the amount of fees and expenses incurred by the receiver. Nonetheless, for future guidance we do address the receiver's argument -- made in anticipation of the subsequently filed Commission motion for distribution of Cobalt assets -- that

he and the other receivership professionals should be paid strictly by a lodestar analysis. In that subsequent Commission motion, the Commission proposes a percentage approach.

The lodestar method "scrutinizes the fee petition to ascertain the number of hours reasonably billed and then multiplies that figure by an appropriate hourly rate." SEC v. Goren, 2003 WL 24257501, at *3 (E.D.N.Y. Apr. 30, 2003) (quoting Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000)). Alternatively, the percentage theory awards a fee that equals some percentage of the recovery by the entity. Goren, 2003 WL 24257501, at *3. Under the percentage theory, courts may still consider the same "less objective" factors as under the lodestar analysis, and courts at all times are to act in moderation when awarding fees. Id.

In the current circumstances, we view it as at best speculative whether the corpus of identified Cobalt assets is likely to be appreciably increased in the near, or even the foreseeable, future. Since the fees and expenses now documented by the receivership are grossly disproportionate to what is available to pay the professionals, we conclude that a lodestar approach to such compensation is simply impractical, at least with regard to the payment of the receiver and others involved in the pursuit of

such assets on behalf of the estate. Moreover, we agree with the analysis of Magistrate Judge Boyle in Goren, 2003 WL 2425701, at *3-4, to the effect that in these circumstances -- in which a section 21(d) receiver acts to form a common fund for the benefit of investors -- compensation may properly be measured on the basis of a percentage of the accumulated fund, as suggested by the Commission in its proposed plan. This is particularly true when the accumulated assets are almost equaled, or even dwarfed, by the fees incurred on a hourly basis.[19] That said, as our circuit has noted in the context of fee awards in a common-fund context, the reasonableness of a percentage award may properly be tested by the comparative use of a lodestar analysis. See, e.g., Masters, 473 F.3d at 436 (citing Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 49-50 (2d Cir. 2000)).[20] Thus, for future determination of

---

[19] We recognize that this aspect of Judge Boyle's analysis was rejected by Judge Platt in SEC v. Goren, 272 F. Supp. 2d 202 (E.D.N.Y. 2003), but we conclude that the Magistrate Judge's assessment better accounts for the policies that underlie the decisions of numerous courts in comparable circumstances to utilize a percentage formula rather than a lodestar analysis. See generally Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007). Judge Platt based his analysis primarily on the assumption that the role of the receiver was somehow different from the common fund case (in which a plaintiff and his attorney recover some amount of money to which others have a claim and then seek to use a portion of that fund for attorney fees), preferring to analogize to the function of a trustee. Goren, 272 F. Supp. 2d at 206-07.

[20] In Masters, for example, the court found it appropriate to award fees based on a percentage of recovery, but used the lodestar method as a cross-check. Masters, 473 F.3d at 436. It considered the factors enumerated in Goldberger, 209 F.3d 43, to

the amount of compensation properly awarded to the receiver in this case, we view both forms of analysis as available to the court to ensure that the interests properly viewed as relevant to this exercise are fully served.

In sum, we recommend that the receiver's motion for an interim award of $733,488.27 (or $748,488.27) be denied without prejudice and that the determination of the appropriate compensation for the receivership professionals be reserved for the determination of a plan for distribution of the available Cobalt assets.

2. The Receiver-Discharge Motion

The Commission subsequently moved to terminate the receiver from his position, based in part on the notion that he has a disabling conflict of interest with the Cobalt shareholders by virtue of his fee demand, which would largely exhaust the Cobalt estate and deprive the shareholders of virtually any recovery. The Commission also argues that the receiver has largely completed

---

determine what an appropriate fee would be, taking into account that courts in common fund cases typically emphasize modesty: "(1) Counsel's time and labor; (2) the litigation's complexities and magnitude; (3) the litigation risks; (4) quality of representation; (5) the relationship of the requested fee to the settlement; and (6) considerations of public policy." Id. The arguments made by the receiver and the Commission properly address these factors and will be useful in the ultimate analysis.

whatever tasks he can usefully perform on behalf of the
shareholders -- principally the marshaling of the Cobalt assets.
Finally, the Commission asserts that the only remaining task for
the receiver is to wind up the lawsuits that he has filed on behalf
of Cobalt, and it suggests that Mr. Paduano may be discharged and
then reappointed for that limited role, with compensation to be
based on a contingency arrangement. (Decl. of Nancy A. Brown, Esq.
¶¶ 7-29, May 3, 2007; Mem. of Law in Supp. of Pl. SEC's Mot. to
Discharge the Receiver 6-17.)

The receiver opposes the motion, suggesting that more work is
necessary to finish the asset-collection process. Much of his
response, however, is dedicated to a critique of what he perceives
to be the failings of the Commission in dealing with him and
protecting the interests of the Cobalt investors. (May 31 Paduano
Aff. ¶¶ 7-34.)

We need not assess the rights and wrongs of the somewhat
tangled history of relations between the Commission and the
receiver. The salient facts that must govern the court's handling
of the Cobalt estate at this point are that (1) the assets of the
estate are, at present, very limited in comparison to the claims of
defrauded shareholders and creditors, (2) the tasks assigned to the
receiver to marshal the assets of Cobalt are largely completed

insofar as they involve locating accounts and other property belonging, or owed, to the Cobalt entities, transferring those assets to the estate and dealing with the claims of secured creditors, (3) there remain several outstanding lawsuits commenced by the receiver that might yield some additional funds, and (4) the principal potential alternative source of funds -- from the Cobalt principals themselves (if they have squirreled them away) -- is unlikely to be available to the receiver in the near future, if ever, and is most likely to be unearthed, if at all, in the context of the criminal prosecution of these individuals and its ultimate resolution.

That said, it is apparent that there are some limited tasks that the receiver is appropriately left to pursue, principally involving the completion of the outstanding lawsuits on behalf of the Cobalt entities and the rendering of an accounting of the Cobalt estate. The Commission's expressed concerns about the occasionally profligate expenditure of time and money by the receiver may be adequately addressed -- at least in the future -- by placing him explicitly on a contingency basis in handling these lawsuits, and we so recommend. Furthermore, even if we assumed -- as we do not -- that the size of the receiver's interim fee application posed a conflict of interest (rather than arguably showing a lack of judgment), that conflict is avoided by (a) the

recommended denial of the interim fee application and (b) the specification that any further work of the receiver in pursuing the open litigation be done on a contingency-fee basis.

Given these needs of the estate, we recommend that the application of the Commission to remove the receiver and then reappoint him be denied insofar as it seeks to impose a two-stage process on what should be one unitary court decision. We instead would decline to terminate the receivership based upon the explicit recognition that the receiver's principal remaining tasks are limited to the lawsuits and an accounting, and that any further work done on the open litigations be compensated on the basis of a contingency fee. Furthermore, in view of the proffered evidence from the Commission that the receiver has, until now, been reluctant, or simply slow, to open his books to the Commission, we further recommend that the receiver be explicitly instructed to cooperate fully and without reservation with any request by the Commission for data concerning all aspects of the receivership.

3. <u>The Commission's Proposed Distribution Plan</u>

The Commission has moved for an order scheduling a hearing on a proposed plan of the Commission's devising, which would distribute all current assets to the investors and creditors of

Cobalt and the receiver after accounting for the administrative expenses of implementing the plan. The plan contemplates an initial set-aside of $50,000.00 for compensation of a plan administrator. It then proposes payment of all currently remaining funds in the estate, with fifty percent going to the shareholders and twenty-five percent each to the remaining creditors and the receivership professionals (including the receiver and the various firms and individuals whom he hired to assist in managing the affairs of the Cobalt estate). (May 24 Brown Decl. First Ex. A (proposed plan) ¶¶ 9, 10 16(c).) The plan also provides that if additional funds come into the receivership, they are to be distributed in accordance with the same formula. (Id. at First Ex. A (proposed plan) ¶ 17(c).) As for the amounts to be distributed, rather than provide for investors and creditors to file claims, the Commission's proposal lists the known investors and creditors and specifies the amounts of each of their respective investments and (in the case of creditors) the size of Cobalt's debts to each creditor -- figures apparently based on Cobalt records supplied to the Commission by the receiver and intended to be used to determine the amounts to be distributed to each claimant. (Id. at First Ex. A (proposed plan) at Exs. Second Ex. A-E.)

As for the logistics of the notice-and-comment period, the Commission proposes that, within ten days after court approval of

its motion, it would distribute copies of the plan and its memorandum of law in support of its current motion to all so-called "Eligible Claimants"[21] and post copies of those documents on both its website and the website of the receiver. The Commission further proposes that the court set a deadline of sixty days from the delivery of this notice for any affected parties to send their objections to the Commission, with the Commission to file the objections and its responses within thirty days thereafter. Moreover, as part of its response the Commission would have the option of amending its proposed plan to take those objections into account. Finally, the court would then be expected to schedule a hearing at which to consider both the plan and the objections. (See May 24 Brown Decl. at First Ex. A (proposed plan) ¶¶ 1-4; May 24 Brown Decl. ¶¶ 3-4.)

The receiver opposes the application and apparently seeks to

---

[21] "Eligible claimants" are defined in the plan in terms of the fund that would be applicable to them. "Eligible Claimants Fund I" means "the investors who were defrauded as a result of the violations alleged in the Commission's complaint," "the unsecured creditors of the Cobalt entities with undisputed claims" and claims by the IRS, and the receiver, his firm and professionals retained by him. "Eligible Claimants Fund II," which will be distributed only if further funds come into the estate, means the investors, the unsecured creditors, and the "unsecured creditors of the Cobalt entities with disputed claims [identified herein] whose claims have been resolved through litigation or settlement with the Receiver, or, if appropriate, with the Commission" on or before the date of the distribution. (May 24 Brown Decl. at First Ex. A (proposed plan) ¶¶ 14-15.)

block the procedure proposed by the Commission for notice and a hearing on the plan. In doing so, he urges that the plan is premature since the full amount of available assets will turn on the results of his lawsuits against the former Cobalt attorneys and marketers. According to the receiver, since the ultimate size of the estate's assets is unknown, adoption of the plan will likely lead creditors to pursue otherwise avoidable litigation since they will be unable to determine what they are likely to receive under the plan when the receivership has been completed. (July 13 Paduano Aff. ¶¶ 4-6.) He also argues that the plan is defective for a number of substantive reasons, including: (1) the Commission's failure to justify the formula for distribution of assets or to comply with the "absolute priority rule" followed in bankruptcy, (2) the incentive that the plan creates for unhappy creditors to place Cobalt into involuntary bankruptcy, the costs of which would exhaust available Cobalt assets, (3) the inclusion of erroneous lists of unsecured creditors, (4) the failure to account for creditor claims that have been released or are subject to challenge, (5) the failure to provide for the filing of claims and challenges until after moneys have been disbursed, (6) the failure to account for payments made by Cobalt to some of the investors before the collapse of the alleged Ponzi scheme, (7) the failure to recognize the potential size of administrative costs, which are likely to overwhelm the limited assets now on hand in the

receivership, and (8) the failure adequately to compensate the receiver and other receivership professionals. (July 13 Paduano Decl. ¶¶ 10-27.)

In the Commission's reply, it has amended the plan in certain respects to account for technical errors noted by the receiver. Specifically, it has dropped or recharacterized certain creditor claims and has acknowledged the need to reduce the calculated losses of some of the investors based on payments that they received from Cobalt. It also has offered, if necessary, to bear the administrative burden of the plan and thereby save on expenses. (<u>See</u> Decl. of Nancy A. Brown, Esq. ¶ 2 & Ex. A, Aug. 3, 2007; Reply Mem. of Law in Supp. of Pl. SEC's Mot. for Order Setting Distribution, Objection and Hearing Schedule and for Order Approving its Proposed Plan for Distribution of Receivership Assets 2-5.)

The first question we confront is whether to proceed at this stage through a full-scale notice-and-comment procedure. In this regard, we conclude that the technical objections of the receiver to the details of the proposed plan are properly reserved for the comment stage, although, as noted, the receiver's articulation of those objections has already led the Commission to make certain amendments to its plan. More significant, however, is the question

of timing. The most salient concern in this regard is that we do not know at present whether the assets available for distribution will be substantially augmented in the coming months or years as the receiver pursues the two litigations still outstanding on behalf of the Cobalt estate. That uncertainty raises at least a question as to whether the process of proposing the plan and soliciting comments is simply premature and therefore likely to require the investment of more time and money than is warranted at present, particularly in view of the very limited resources currently available to pay for the many claims on the estate.

The likely time-frame for resolution of these lawsuits is quite opaque. We recently issued a report and recommendation counseling in favor of dismissing only a portion of the receiver's suit against the former attorneys of Cobalt in <u>Cobalt v. Shapiro</u>, but the final resolution of that motion is of course still open, and if some part of that case survives, the parties will still have to pursue discovery and likely summary-judgment motion practice unless they settle the case. Moreover, the receiver's claims against the Cobalt principals are stayed pending the completion of the prosecution of those individuals, with no resolution expected for some considerable time. <u>See</u>, <u>e.g.</u>, <u>United States v. Shapiro</u>, 2007 WL 2914218 (S.D.N.Y. Oct. 1, 2007) (currently in the process of adjudicating attorney-client claims in pre-trial discovery). The

receiver's suit against the marketers of Cobalt, <u>Cobalt v. Arden</u>, has remained quiescent since it was filed, although a number of defendants have been served. In that suit, the receiver may have to pursue default judgments and/or discovery against some of those defendants, with the possibility perhaps of some settlements or the discovery that some or all of the defendants are largely judgment-proof.

On balance, and particularly given the uncertainties of the process for bringing the receiver's lawsuits to a final resolution, we conclude that publication of the Commission's plan for asset distribution and an invitation for comments will be the most efficient approach to appropriate distribution of the estate assets. If nothing else, it will allow the court to learn the views of those individuals and entities that have the most at stake in this process -- the investors and creditors of Cobalt -- and, by the time the comment period concludes, we may have a more precise understanding of the likely timing of the lawsuits and the extent to which they may prove a source of significant additional funds for the estate. In making this recommendation, we do not intend to suggest any view as to the merits of any part of the Commission's plan but rather view the proposed process as a mechanism for obtaining further information regarding the merits and demerits of the approach advocated by the Commission.

To assist in this process, we recommend that before notice and comment are undertaken, the Commission be required to supplement its plan and memorandum of law with a written explanation of the basis for its proposal -- particularly its distribution formula -- for inclusion in the materials to be distributed to Eligible Claimants. This will likely sharpen the focus of claimants' comments on the plan and will also assist the court in assessing whether the plan is fair and reasonable.

## CONCLUSION

For the reasons noted, we recommend as follows:

(1) that the motion of the Commission for entry of a default judgment against the Cobalt defendants be granted except with regard to the requested imposition of penalties, and that that aspect of the motion be denied without prejudice;

(2) that the motion of the receiver for an interim award of fees be denied without prejudice;

(3) that the motion of the Commission to terminate the receiver and rehire him for limited purposes be denied, except with the caveat that the Court should, in its denial, specify (1) that

the role of the receiver is hereafter to be limited to (a) pursuing the pending lawsuits in <u>Cobalt v. Shapiro</u>, 06 Civ. 6468 and <u>Cobalt v. Arden</u>, 06 Civ. 6172, (b) providing an accounting of the receivership upon future direction by this court, and (c) addressing any issues raised in the course of the notice-and-comment process regarding any proposed plan for distribution of estate assets and the winding-up of the receivership, and (2) that any work on the pending lawsuits will be compensated on a contingency-fee basis;

(4) that the motion of the Commission to set a schedule for notice and comment on its proposed plan for distribution of the currently available receivership assets be granted, albeit with the caveat that the Commission first prepare for distribution a written explanation of, and justification for, the timing and substance of the plan; and

(5) that the court deny the receiver's request for a stay of the Commission's lawsuit.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries,

Kimba M. Wood, Room 910, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Dated: New York, New York
       December 28, 2007

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

50

Copies of the foregoing Report and recommendation have ben mailed
today to:

Mark K Schonfeld, Esq.
Nancy A. Brown, Esq.
Paul W. Ryan, Esq.
Securities and Exchange Commission
3 World Financial Center
New York, New York 10281

Leonard Weintraub, Esq.
Joseph E. Gasperetti, Esq.
Alicia Etre, Esq.
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020

Deborah Deitsch-Perez, Esq.
Lackey Hershman, LLP
3102 Oak Lawn Avenue
Suite 777
Dallas, Texas 75219

Martin Leppo, Esq.
Leppo & Leppo
7 Christy's Drive
Brockton, Massachusetts 02301

Denis P. Kelleher, Esq.
Kelleher & Dunne LLP
17 Battery Place
New York, New York 10004

Raipher Pellegrino, Esq.
Raipher D. Pellegrino Assoc. P.C.
265 State Street
Springfield, Massachusetts 01103

Marc J. Gurell, Esq.
Seyfarth Shaw LLP
1270 Avenue of the Americas
Suite 2500
New York, New York 10020-1801

Robert F. Cohen, Esq.
280 Broad Street
Bristol, Connecticut 06010