```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,
                                       :
               Plaintiff,
                                       :
       -against-                           REPORT & RECOMMENDATION
                                       :
COBALT MULTIFAMILY INVESTORS I, LLC,       06 Civ. 2360 (KMW)(MHD)
COBALT MULTIFAMILY CO. I, LLC,         :
COBALT CAPITAL FUNDING, LLC. MARK A.
SHAPIRO, IRVING J. STITSKY and         :
WILLIAM B. FOSTER,
                                       :
               Defendants,
                                       :
          and
                                       :
VAIL MOUNTAIN TRUST,
                                       :
               Relief Defendant.
---------------------------------------x
```

TO THE HONORABLE KIMBA W. WOOD, U.S.D.J.:

Plaintiff Securities and Exchange Commission ("SEC") has applied to the court for approval of its plan for distribution of the currently available receivership assets derived from the Cobalt family of companies, which are defendants in this case. Objections to the plan have been filed by the previously appointed receiver, Anthony Paduano, Esq., as well as by his law firm Paduano & Weintraub LLP, by a host of other law firms and accountants hired by the receiver to provide professional services in connection with the recovery of Cobalt assets, and by seven Cobalt shareholders and

1

creditors. For the reasons that follow, we recommend that the proposed plan, if amended in accordance with proposals made in the SEC's reply papers, be adopted.

Background

The SEC commenced this lawsuit in the wake of the collapse of the defendant Cobalt entities. Those companies were allegedly used as vehicles for an ongoing scheme perpetrated by their principals, who are also defendants in this case, to defraud potential investors. At the time of filing, the plaintiff successfully applied for court appointment of a receiver to marshal the assets of the defunct entities for the benefit of shareholders and creditors. The appointed receiver, Mr. Paduano, and his law firm in turn hired a number of other law firms and accountants to assist in the task of recovering assets.[1] As of January 9, 2009, the SEC reports, the receiver had gathered $1,205,531.02 in Cobalt funds, of which $454,000.00 had been recovered from bank and brokerage accounts before the receiver was appointed.[2] (SEC Reply Mem. at 7

---

[1] We refer to these firms and individuals as the "receivership professionals."

[2] As of May 26, 2009 the Receiver held $1,210,707.80 in cash accounts and $105,182.70 in securities. (Letter from Leonard Weintraub, Esq. to the Court dated May 26, 2009). As of May 2, 2008, the United States Attorney's Office for the Southern

& n.5). Additional funds may yet be recovered by the receiver from two pending sets of lawsuits -- one against various law firms that performed legal services for the Cobalt entities and their principals during the period of the alleged fraud (Cobalt v. Shapiro, 06 Civ. 6468 (S.D.N.Y.)), and the other against sales personnel used by defendants to entice members of the public to invest in Cobalt (Cobalt v. Arden, 06 Civ. 6172 (S.D.N.Y.)).

In early 2007 the receiver applied for an interim award of fees and expenses for himself, his law firm and the various other law and accounting firms that he had hired. In that request the receiver sought initial payment of more than $733,000.00 out of a fund then totaling approximately $970,00.00. In the course of that application, Mr. Paduano also reported that accrued fees billed by him and his firm and by the other receivership professionals amounted to more than $2.7 million for the period from March 28, 2006 to the end of 2006.

The plaintiff opposed this interim-payment application. Instead, the SEC applied for authorization of a plan for

---

District of New York held an additional $457,109.66 in cash seized prior to the filing of the SEC action, and these funds will also be distributed pursuant to the provisions of the approved plan. (SEC Mem. at 4 & n.2).

distributing the estate's collected assets.[3] Under the terms of the plan, there would be two principal staged distributions of estate assets. (See SEC Plan for Distrib. of Receivership Assets ("SEC Plan") ¶ 9). The first distribution, of assets currently held by the receiver, would follow a formula providing for payment of 50 percent of the funds to defrauded shareholders on a pro rata basis, 25 percent to both unsecured creditors with undisputed claims (up to 50 percent of their claims) and the Internal Revenue Service, and 25 percent to the receiver and the other professionals that he had hired to assist his endeavors. (SEC Plan § D). As for secured trade creditors, they would be authorized to pursue their rights against certain Cobalt properties in Texas. (SEC Plan ¶ 18).

The second distribution would be of any after-acquired assets obtained by the receivership estate, most likely to come from the Shapiro and Arden lawsuits commenced by the receiver. (SEC Mem. at 4 & n.3). Those funds would be distributed on the basis of (A) one-third to the defrauded shareholders, (B) one-third to (1) all unsecured creditors (whether or not their claims are disputed), (2)

---

[3] The SEC also moved for entry of a default against the Cobalt entities, as well as for an order discharging the receiver. The court granted default in part, and denied the motion to terminate the receivership with the proviso that the receiver's future role would be limited to pursuing the affirmative Cobalt lawsuits. (See Order dated Mar. 24, 2008).

4

all taxing authorities, (3) the judgment creditors from two specified Texas lawsuits to the extent that any judgment is not satisfied by payments from the defendants' insurers,[4] and (4) the secured creditors holding deficiency judgments for claims secured by Cobalt's Texas properties, and (C) one-third to the receiver for distribution among the receiver and the receivership professionals. (SEC Plan § E).

The plan also provided for appointment of a distribution agent (with the possibility of that role being performed by the SEC without charge) (SEC Plan § G) and the filing by payment recipients of objections with the SEC and the distribution agent if they contested the amount of their payment. (SEC Plan § F). The plan also specified the time frame in which calculations and payments of the first distribution were to be made (SEC Plan ¶ 20) and the time frame for later distribution of any subsequently acquired assets (SEC Plan ¶ 21), and it also provided for a final distribution of any abandoned assets. (SEC Plan ¶¶ 24, 26, 27). The plan also specified that any secured creditors not otherwise accounted for in the plan could request a lifting of the current stay on their

---

[4] These lawsuits are <u>Jones v. DSP-HP 2002, Ltd.</u>, Civ. No. 2006-13869 (Harris County Tex. Dist. Court) and <u>Alvarado v. North Am. Equities, LP, et al.</u>, Civ. No. 2006-35219 (Harris County Tex. Dist. Court).

enforcement of their rights in the secured property. (SEC Plan ¶ 29). Finally, attached to the plan were (1) a list of identified Cobalt investors and the amounts of their investments, (2) a schedule of the Cobalt unsecured creditors with undisputed claims and IRS claims, (3) a list of the claims of the receiver and his professionals for work through December 31, 2006, (4) a list of the disputed unsecured creditors and the amounts of their claims, (5) a schedule of claims by non-IRS taxing authorities, and (6) a list of trade creditors with disputed claims allegedly secured by Cobalt's Texas properties. (SEC Plan Exs. A-F).

The receiver has opposed the plan, arguing that the proposed distribution is unfair to him and the other receivership professionals, that the plan is premature and that, as initially drafted, it contained other technical defects. During the course of briefing this motion, the receiver agreed that, for purposes of his work on the pending affirmative lawsuits for Cobalt, he would alter his fees to a contingency basis. (See Stipulation and Order dated Jan. 24, 2008).

The court ultimately denied the receiver's motion for an interim fee-and-expense award. (See Order dated Mar. 24, 2008). Moreover, after some modifications of the SEC plan, the court

authorized its publication and specified a time period for objections by interested parties. (See Orders dated July 1, 2008 & Oct. 7, 2008). Briefing of the dispute was completed in January 2009. We now recommend that the plan, as amended, be adopted.

ANALYSIS

At the present time, the Cobalt receivership estate has in hand slightly more than $1.3 million and the United States Attorney's Office holds about $457,000. The losses by shareholders exceed $23 million, creditors' claims total approximately $4.5 million and the receiver and other receivership professionals have billed approximately $3 million in fees and expenses. In short, reimbursement necessarily will cover only a small fraction of accumulated losses and other claims.

In addressing this problem, the SEC proposes a method of allocating the very limited resources at hand, giving shares to the administrators of the estate, to the creditors of Cobalt and to the Cobalt shareholders, with the largest share (although not the largest percentage of outstanding claims) going to the shareholders. In assessing that proposal, we start with the principle that in distributing disgorged profits, the courts are to

accord an SEC recommendation considerable weight and are to review it simply to determine whether the proposal is "fair and reasonable". See, e.g., Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 82-83, 84 (2d Cir. 2006); SEC v. Wang, 944 F.2d 80, 83-84, 85 (2d Cir. 1991).

This liberal standard reflects the fact that the SEC may determine, in the first instance, whether to pursue a distribution plan with the purpose of compensating injured investors and other claimants. See, e.g., Official Committee, 467 F.3d at 83 (citing SEC v. Fischbach Corp., 133 F.3d 170, 175-76 (2d Cir. 1997); id. at 84-85;  SEC v. Certain Unknown Purchasers of the Common Stock of and Call Options for the Common Stock of Santa Fe Int'l Corp., 817 F.2d 1018, 1021 (2d Cir. 1987)). If it does so, it then has broad discretion in determining how best to allocate funds to reimburse individuals and institutions with legitimate claims. See Official Committee, 467 F.3d at 84. In this regard there is no question that "when funds are limited, hard choices must be made" and in that circumstance the SEC and the court may permissibly adhere to the principle that "the most grievously injured claimants should receive the greatest share of the fund." Id. (quoting Santa Fe, 817 F.2d at 1021).

The proposed plan in this case follows these principles. With claims far in excess of currently available funds, the plan would provide half of those funds to the shareholders, whose losses far outstrip in size all other claims, including those of the creditors -- both secured and unsecured -- and the receivership professionals. That allocation is certainly justified given the extent of the investor losses. Moreover, the proposed respective payments would actually provide a larger reimbursement, as a percentage of their claims, both to the unsecured creditors and IRS and to the receivership professionals, than to the shareholders.[5]

In opposing the plan, the receiver and the other receivership professionals complain that they should be paid first, with all of them (except for the receiver and Paduano & Weintraub LLP) to receive full payment of their bills, including fees and expenses, and with the receiver and his firm to be compensated fully for their expenses (Decl. of Anthony Paduano, Esq., executed Jan. 23, 2007, ¶¶ 4-5) -- a payment that would approximate $650,000.00. (Id. at ¶¶ 9-16). Such a payment would amount to more than half of the funds currently held by the receiver and, even including the

---

[5] The shareholders would receive fifty percent of the funds allocated during the first distribution even though their losses constitute approximately seventy-five percent of the total claims on the Cobalt estate.

additional money held by the United States Attorney's Office, the proposed payment would be a sizeable portion of all available funds.

The receiver's argument is unpersuasive. It rests on his citation of the priorities specified by the Bankruptcy Code, 11 U.S.C. § 510(b), but this case is not in the Bankruptcy Court, and the Second Circuit has held that in these circumstances the SEC is not required to follow the Code priorities "when developing a distribution plan." <u>Official Committee</u>, 467 F.3d at 85.

As for the objections of the receivership professionals, these parallel the complaints of the receiver. In essence, they argue that they would not have agreed to provide their services if they had known that they would not be fully compensated for those services, and that to deny them full compensation at this time is inequitable. (<u>See</u> Aff. of Franklin D. O'Toole, executed Dec. 12, 2008 at ¶ 10; Aff. of Alvin F. Lindsay, Esq., executed Dec. 12, 2008 at ¶¶ 2-3, 10; Aff. of Brian R. Forbes, Esq., executed Dec. 11, 2008 at ¶ 7; Aff. of David B. Dyer, Esq., executed Dec. 11, 2008 at ¶ 8; Aff. of Keith Cramer, executed Dec. 12, 2008 at ¶ 8). With due respect for their desire for full compensation -- and without a detailed examination of their time and billing records --

we note that they have no legal entitlement to be paid in full at this time.[6] Moreover, on the matter of fairness, we are offered no suggestion that they were promised by anyone with authority to bind the court or the SEC that the receivership estate would be large enough to ensure full or even prompt payment of the entirety of their billed fees and expenses. Indeed, they were at least on constructive notice that the estate resulted from an allegedly fraudulent investment scheme, with the perpetrators having assertedly made off with most of the invested funds, leaving in all likelihood a small percentage to be gathered and distributed for the benefit of the victims of the fraud. Necessarily, then, in signing up with the receiver, they bore a risk of which they most assuredly should have been aware at the time that they would receive only partial payment. Finally, as we have noted, the current proposal contemplates only an interim payment, with additional funds that may come into the estate -- most likely through the receiver's two pending lawsuits -- to be distributed in

---

[6] The SEC argues that the fees generated by the receiver and the other receivership professionals are grossly disproportionate to the benefits that they conferred on the estate. On its face this assertion is at least colorable but we need not undertake the sort of detailed assessment of the professionals' time charges to make a determination at present. (Indeed, the current record would be inadequate to make a nuanced assessment of how and why nearly $3 million was billed by the receiver and the receivership professionals in the first nine months of the receivership.)

the future equally to shareholders, to creditors and other claimants and to the receivership professionals. Hence, depending on the size of any future recovery, it is possible that the receivership professionals will ultimately be paid in full or at least more substantially than at present.

Apart from these objections, the receiver and his professionals complain that the SEC plan does not specify a basis for distributing the receiver's share among his professional team. Since the amount to be given the receiver represents a limited proportion of the outstanding receivership professionals' bills, we conclude that the plan should specify that payments from the first distribution be made by the receiver on a <u>pro rata</u> basis. As for the second distribution -- if and when funds are available for this purpose -- if any of the professionals object to that formula, that objector may request relief from the court.

The remaining objections to the plan were voiced by a handful of shareholders and creditors. (Decl. of Nancy A. Brown, Esq., executed on Jan. 9, 2009, at ¶¶ 3-7 & Exs. A-G). The shareholder objections concern details of their holdings, which were listed as exhibits to the plaintiff's original application for approval of the plan. (<u>See</u> Brown Decl. ¶ 3 & Exs. A-C). Those disputes are

anticipated by the plan, which contains a provision specifying adequate procedures for claims resolution. (<u>See</u> SEC Mem. at 3; SEC Plan § F).

A communication by a self-described secured creditor, Coleman Contracting Group, Inc., reports that it has three mechanics and materialman's liens on certain Texas properties owned by Cobalt, and that it understands that these liens are unaffected by the proposed SEC plan. (Brown Decl. Ex. D). The plan specifies that "Texas Properties Trade Creditors" are free to pursue their claims against the Texas properties and further specifies that if they have a deficiency judgment, they may share in the second-round Cobalt distribution fund. The only further step required to deal with the Coleman notice is, as the SEC proposes, to correct the plan by switching Coleman from a list of unsecured creditors to the list of "Texas Properties Trade Creditors".

A separate set of objections by Ket Enterprises, Inc. is mostly wide of the mark. (Brown Decl. Ex E). It says that the plan improperly discriminates against Texas-based creditors of Cobalt. (<u>Id.</u> at 2). The reference is to a provision allowing creditors whose claims are secured by the Texas properties to proceed first against those properties and then, if the debts are partly

unsatisfied, to collect a share of any assets subsequently acquired by the estate in the second stage of distribution. This provision does not target Texas creditors. Rather it provides a mechanism for creditors (wherever they are located) to proceed to foreclose on secured properties, which happen to be located in Texas, and then, if they have a deficiency judgment, to share with unsecured creditors in the second distribution of assets. There is nothing discriminatory or improper in this provision.

Ket then complains about a cap of 50 percent on the reimbursement of unsecured claims. (Id. at 3). This provision concerns only the first distribution of assets, for unsecured creditors, in which Ket will not participate. The second-stage distribution contains no cap, and hence if there are sufficient assets in the estate, the creditors, including Ket, will be able to recover up to 100 percent of their claims.

Finally, Ket seems to complain about the failure of the SEC in its first version of the plan to list its judgment among those of the secured creditors. (Id. at 2). That omission is being corrected by the SEC, so that the judgement in Ket's favor in the amount of $739,935.97 will be included on that list.

A separate objection by a shareholder, Charles Lubetkin, involves a complaint that the proposed distribution would give shareholders only 3.75 percent of their investments whereas unsecured creditors would receive approximately 17 percent of their claims. (Brown Decl. Ex. F). The objection, which focuses solely on the first-stage distribution, is unpersuasive. At that stage, the shareholders will receive half of the available assets, compared to one-quarter for the unsecured creditors. Notably, if Cobalt had been placed into bankruptcy, the shareholders would almost certainly have received nothing in view the current imbalance between available assets and the claims of creditors and administrative expenses, both of which have priority over investors. While one may debate the merits of the 2:1 ratio in favor of shareholders, it cannot be said that the plan is not fair and reasonable from the perspective of its treatment of shareholders.

The last objection is by another investor, Mr. Florin G. Sutton. (Brown Decl. Ex. G). He complains about the difference in the allocation of assets to the receivership professionals between the first and second stages of asset distribution and proposes adoption of a "fixed percentage . . . similar to a contingency fee" or payment of the receivership expenses "a la carte." Again, a

number of different approaches could have been taken, but Mr. Sutton does not demonstrate that the path selected by the SEC was not "fair and reasonable".

CONCLUSION

For the reasons noted, we recommend that the proposed distribution plan of the SEC (as amended) be adopted, with the one added specification that the funds from the first distribution made to the receiver should be disbursed to the receivership professionals on a pro rata basis.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Kimba M. Wood, Room 1610, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); Small v.

16

Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**Dated: New York, New York**
      **May 28, 2009**

_____
**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed today to:


Nancy A. Brown, Esq.
Paul W. Ryan, Esq.
Securities and Exchange Commission
3 World Financial Center
Room 4300
New York, New York 10281

Leonard Weintraub, Esq.
Anthony Paduano, Esq.
Steven Castaldo, Esq.
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020

Ms. Mary Kay Humfelt
2818 Fallfax Drive
Falls Church, VA 22042-2804

Gerald L. Wallace, Esq.
One Greenway Plaza, Ste. 950
Houston, Texas 77046

Will G. Dickey, Esq.
1717 St. James Pl., Ste. 230
Houston, Texas 77056-3496

Jay L. Lubetkin, Esq.
293 Eisenhower Parkway, Ste. 100
Livingston, NJ 07039

Mr. Florin G. Sutton
242 East 79th Street, Apt. 3B
New York, NY 10075

Martin Kenneth Leppo, Esq.
Leppo & Leppo, L.L.P.
7 Christy's Drive, Suite 1
Brockton, MA 02301

Deborah Deitsch-Perez, Esq.
Lackey Hershman, L.L.P.
3102 Oak Lawn Avenue, Ste. 700
Dallas, TX 75219

David Larry Tillem, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.
150 E. 42nd Street
New York, NY 10017

Daniel Gerard Lyons, Esq.
Westerman, Ball, Ederer, Miller & Sharfstein, L.L.P.
170 Old Country Road
Mineola, NY 11501

Mr. William B. Foster
290 Main Street
East Hampton, MA 01027